William T. CLARK, III,
Plaintiff–Appellant,

v.

TROY AND NICHOLS, INC. and Residential Funding Corporation,
Defendants–Appellees.

No. 88–3360.

United States Court of Appeals,
Fifth Circuit.

Feb. 10, 1989.

Rehearing Denied March 17, 1989.

James G. Perdigao, New Orleans, La., for plaintiff-appellant.

Robert J. Brilliant, Donald A. Meyer, New Orleans, La., for defendants-appellees.

Before THORNBERRY, GEE, and POLITZ, Circuit Judges.

GEE, Circuit Judge:

### The Facts

William Clark, the plaintiff/appellant, was seeking financing in order to purchase a residence. Troy & Nichols, the defendant/appellee, [T & N] provided Clark with a flyer advertising a special, fixed-rate mortgage to buyers with a substantial down payment or equity. The flyer stated that under the special mortgage program (EASYDOCS) tax returns and employment and income verification were not required, debt to income analysis was not required, and verification of loans not shown on the credit report was not required. The flyer further advertised that such loans would be available if the property to be purchased was a single-family, owner occupied dwelling; if the amount of the requested loan was more than $50,000 and less than $600,-000 and the borrower had and proved possession of a down-payment in excess of 35% of the value of the property; and if the borrower had an excellent credit history and two appraisals substantiated that the value of the property exceeded the value of the loan plus the down-payment.

Clark discussed the EASYDOCS program with David Deichman, a loan officer for T & N, and decided to apply for a 30–year fixed rate mortgage under the program. Clark and Deichman then filled out an application listing the assets to be used for the 35% down-payment. At that time Clark gave T & N a $534.00 non-refundable application fee. After completing the application Deichman then asked Clark if he would be interested in locking into an agreed upon interest rate for a period of 30 days. Deichman presented a form entitled

"Troy & Nichols, Inc. Rate & Discount Agreement for RFD (Residential Funding Corporation, co-defendant in this case) Limited Documentation Loans Only." This agreement stated that if Clark's loan was approved within 30 days T & N agreed to lend the money at the interest rate specified in the agreement, regardless of the state of interest rates at the time of the loan's approval. T & N also agreed to use their best efforts to get the loan approved within the 30-day period. For his part of the agreement, Clark promised to commit himself to the terms of the agreement, regardless of fluctuations in interest rate during the 30-day period. The agreement further provided that in the event that Clark wanted to break the "lock-in" agreement, T & N would release the commitment if Clark paid a 1% origination fee ($2,011.75). Both Clark and Deidman signed this agreement locking the parties into the interest rate stated for a period of 30 days.

The record indicates that the good faith estimates of the disclosures required by the Truth in Lending Act and Regulation Z were sent to Clark by T & N within 3 days after Clark submitted his loan application. Clark received these documents 6 days after he applied for the loan. Over the next month Clark supplied T & N with the requested proof of down payment and appraisals of the property. The parties agreed that Clark's credit history was not at issue. On April 15, 1987, one day before expiration of the 30-day period during which the parties were locked into the stated interest rate, T & N notified Clark that his application for an EASYDOCS loan had been denied. The basis stated for the denial was that T & N (and RFC) "would not grant credit to any applicant on the terms and conditions that Clark had requested."

After T & N denied Clark's application for an EASYDOCS loan, they offered to secure other financing for him. The alternative financing required a 50% down payment and specified a higher interest rate than that specified in the lock-in agreement. Clark refused T & N's offer and obtained financing elsewhere. Because interest rates had risen during the preceding 30 days, Clark was unable to arrange financing on terms as good as those originally offered by T & N in their lock-in agreement.

Clark filed suit in federal district court, alleging that T & N violated Regulation Z of the Truth in Lending Act by failing to deliver good faith estimates of Truth in Lending disclosures before consummation of the loan. Clark further alleged that the disclosures, even if timely, violated the Truth in Lending Act because they were inaccurate and misleading. Clark's complaint also contained pendant state claims. T & N filed a motion for judgment on the Pleadings which the district court, *sua sponte*, converted to a motion for summary judgment on the issue of whether the signing of the Rate & Discount Agreement (the Agreement) was a consummation for purposes of the Truth in Lending Act. Clark filed a cross motion for summary judgment. The district court granted summary judgment for T & N on that issue. R.F.C. then filed a motion for summary judgment on Clark's remaining federal and state claims. The district court granted that motion and Clark appealed.

■ Regulation Z of the Truth in Lending Act states that

(a) *Time of disclosure.* In a residential mortgage transaction subject to the Real Estate Settlement Procedures Act (12 U.S.C. § 1601 et seq.), the creditor shall make good faith estimates of the disclosures required by § 226.18 *before consummation, or shall deliver or place in the mail not later than three buisness days after the creditor receives the consumer's written application, whichever is earlier.* (emphasis added)

Clark concedes that the disclosures required by Regulation Z were mailed within 3 days after his loan application was received by T & N. He contends, however, that the credit transaction was consummated at the time that the parties signed the Rate & Discount Agreement. Thus, according to Clark, T & N was required to provide him with the disclosures before he signed the agreement. The district court

correctly stated that "[t]he only question before the Court is ... was whether the signed Rate & Discount Agreement was a 'consummation' of a consumer credit transaction between plaintiff and defendant."

Regulation Z defines "consummation" as the *"time that a consumer becomes contractually obligated on a credit transaction."* 12 C.F.R. § 226.2(a)(13) (1987) (emphasis added) The official interpretation of the staff of the Division of Consumer & Community Affairs of the Federal Reserve Board states that this definition is

> [A] significant departure from longstanding interpretations of the previous definition. It now focuses only on the time the consumer becomes contractually obligated, rather than the time the consumer pays the nonrefundable fee or suffers an economic penalty for failing to go forward with the credit transaction.

12 C.F.R. Chapter 2, art. 226.2 Supp. 1 at P. 676.

The official staff commentary on this definition provides, in part,

> *State law governs.* When a contractual obligation on the consumer's part is created is a matter to be determined under applicable law; Regulation Z does not make this determination. A contractual commitment agreement, for example, that under applicable law binds the consumer to the credit terms would be consummation. Consummation, however, does not occur merely because the consumer has made some financial investment in the transaction (for example, by paying a nonrefundable fee) unless, of course, applicable law holds otherwise.

Official Staff Comment 12 C.F.R. 226.-2(a)(13). *See also Bourgeois v. Haynes Construction Company,* 728 F.2d 719 (5th Cir.1984).

Clark contends that by signing the Rate & Discount Agreement T & N relinquished its right to deny Clark's loan application provided that Clark met the conditions stated in the EASYDOCS' flyer. According to Clark, therefore, by signing the agreement T & N became obligated to extend credit and Clark became obligated on the credit transaction. In other words, according to Clark, the Agreement constituted an offer by Clark to buy credit and an agreement by T & N to sell credit.

Clark cites no cases addressing the issue of whether such an agreement contractually obligates either party. It strains credulity, however, to believe that a lender would extend credit without *any* investigation. Further, the conditions which Clark was required to meet before T & N was obligated to accept his offer left room for T & N to exercise its discretion in denying Clark's application. Finally, the agreement itself states that "In the event the loan does not close by the above date, the loan becomes open and a new agreement can be negotiated, *unless* the loan is *approved* on or before the 25th day of this agreement." Clearly T & N had not approved the loan as of the date the agreement was signed. Therefore Clark was not obligated on the loan and the credit transaction was not consummated. Under these circumstances the disclosures required under the Truth in Lending Act were timely.

■ Clark further contends that the court erred in granting summary judgment as to the accuracy of the Defendant's truth in lending disclosures because the defendant did not intend to lend money at the rate stated. Clark contends that the purpose of offering the rates was to facilitate a "bait and switch" under which he would receive different less favorable terms of interest. According to Clark, the result of this practice was to make the disclosures inaccurate and untruthful.

The Truth in Lending Act does not provide a cause of action when a lender engages in "bait and switch" techniques. It does require that the lender make certain disclosures with respect to the offered terms. The disclosures made by T & N were accurate with respect to the offered terms. The fact that T & N may not have intended to loan money under the stated terms does not make their disclosures with respect to the stated terms inaccurate.

The order of the District Court is AFFIRMED.

THORNBERRY, Circuit Judge, dissenting:

I agree with the majority that Troy & Nichols retained discretion to investigate Clark's financial status after executing the Rate & Discount Agreement ("the agreement"). However, the conclusion that this discretion reflects an absence of a "consummation" evokes this opinion by which I respectfully dissent.

The agreement expressly states that the "terms of this agreement are hereby accepted" by Clark and Troy & Nichols. At this point, had Clark wanted to back out of the agreement, he would have been committed to pay a penalty equal to 1% of the loan amount or, in this case, over $2000. Thus, he was bound. Whether this is the type of obligation envisioned by the Truth in Lending Act requires a look at Regulation Z, the Act's implementing provision.

Regulation Z provides that "consummation" is the "time that *a consumer* becomes contractually obligated on a credit transaction." (emphasis added). The definitional focus is on the time *the consumer* not the lender becomes bound. "Since TIL is 'consumer protection' legislation, we think the appropriate focus should be on the time of the contact with the consumer. That is, we must examine the transaction through the eyes of the consumer." *Cody v. Community Loan Corp. of Richmond Cty,* 606 F.2d 499, 505 (5th Cir.1979), *cert. denied,* 466 U.S. 988, 100 S.Ct. 2973, 64 L.E.2d 846 (1980).

In *Cody,* a bank associated with an insurance company to market cancer insurance policies at the time loans were extended. The bank negotiated with the plaintiffs for the sale of the insurance policy; however, the bank did not have authority to approve the policy. Instead, once the plaintiff agreed to purchase the policy, the bank forwarded the documentation to the insurer for its approval. We held that, *from the plaintiff's* perspective and for purposes of TIL, the sale occurred at the time the plaintiff agreed to purchase the policy, not when the policy was ultimately approved. Thus, the bank violated TIL by not making suffi-

cient disclosures at the time the plaintiff agreed to purchase the policy.

*Cody* involved determining when a "credit sale" occurred. We resorted to the definition of "consummation" for that issue's resolution. Though not on all fours with the present dispute, I believe *Cody* is so closely analogous to the situation at hand that it should control. Thus, even if Troy & Nichols retained complete discretion to walk away from the agreement (a position with which I disagree as explained below), from the time the agreement was executed Clark remained bound to go forward or pay a 1% penalty. From his vantage point, he was contractually bound.

Alternatively, one might insightfully argue that the agreement bound Clark not "on a credit transaction" as required by Regulation Z's definition of "consummation," but merely on an option to enter into a credit arrangement. However, it seems equally plausible to characterize the agreement as a credit transaction incorporating a 1% liquidated damage clause. While state law governs when a contract arises, characterization of the transaction is a matter of federal law. *Cody,* 606 F.2d at 499. To remain consistent with the universally applied principle of liberally construing the terms of the Truth in Lending Act to effectuate the underlying purpose of consumer protection, I believe the "option versus credit transaction" dialogue should be resolved in the consumer's favor.

Finally, even if one insists on shifting the emphasis of Regulation Z's definition of "consummation" from the time Clark became bound to the time Troy & Nichols became bound, I remain convinced that the agreement obligated both parties. Once the parties agreed on the terms and executed the agreement, a contract was formed. That a contract existed does not mean that the parties were obligated *to perform.* To the contrary, Troy & Nichols expressly conditioned their *duty to perform* on Clark's ability to meet certain conditions. These conditions however were conditions precedent to Troy & Nichols' *duty to perform,* not to the *formation of*

*the contract. See* 5 Williston on Contracts § 666 (3d ed.1961).

A common example of a contract with conditions precedent to performance is an earnest money contract for the purchase of a home. After agreeing on the purchase price and Closing Date, a buyer and seller generally execute an earnest money contract. The buyer's earnest money is placed in escrow until the closing date. The earnest money contract imposes conditions on each party before the other is obligated to perform, i.e. to close. For example, the buyer conditions his performance on the seller's ability to show good title. The seller conditions its obligation to sell on the buyer's ability to present acceptable financing. Despite these conditions (which may or may not be met), after execution of the earnest money contract, the parties are not free to walk away from the deal. The buyer risks losing his earnest money while the seller risks a suit for specific performance. Thus, at the time the earnest money contract is executed, the parties are bound even though not yet obligated to perform.

I detect no legal distinction between an earnest money contract scenario and the agreement at hand and therefore would reverse the district court on this issue.

My thoughts also diverge from the majority's with respect to the second issue—whether the disclosures were accurate. My reading of the majority's opinion suggests that as long as the disclosures *accurately* disclose information necessary to evaluate a credit arrangement, there can be no TIL violation. The majority concludes that even though the lender never intended to extend credit on the terms disclosed, the accuracy of the disclosures remain untainted. In my view, an intention from the outset not to extend credit on disclosed terms is far more egregious than inaccurate terms. On careful review of the disclosures, one might detect an inconsistency between the interest rate promised and the amortization schedule disclosed. By contrast, there is no way to enter the lender's mind to determine whether he means what he discloses.

Disclosures feigning one's true intention, in my view, are inaccurate. As the appellant has presented evidence raising a genuine issue of material fact as to Troy & Nichols' underlying intent, I would reverse the summary judgment and remand this issue for trial.